IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BERYL VANDRE EMERICH,

                    Plaintiff,                    OPINION AND ORDER

v.

                                              18-cv-258-wmc

ANDREW SAUL, Commissioner of
Social Security,

                    Defendant.

Plaintiff Beryl Vandre Emerich seeks judicial review of a final decision denying her application for Social Security Disability Insurance Benefits under 42 U.S.C. § 405(g). On appeal, plaintiff raises two challenges: (1) the Administrative Law Judge ("ALJ") failed to evaluate the evidence of Emerich's shoulder, cervical and lumbar spine conditions properly, including discounting Emerich's treating physician's opinions regarding these conditions; and (2) the ALJ propounded a hypothetical question which failed to address his finding of moderate limitations in concentration, persistence and pace. Having reviewed the record, the court agrees and will remand for further proceedings consistent with the opinion below.

BACKGROUND[1]

**A. Overview of Claimant**

Emerich was born on December 28, 1956. She applied for benefits on January 24, 2014, claiming an alleged onset disability date of November 14, 2012. This made Emerich 55 years-old on the alleged onset date of her disability in 2012; 58 years-old when she

---

[1] The administrative record ("AR") is available at dkt. #5.

applied for disability in 2014; and 59-years-old at the time of her hearing in 2016. Accordingly, at the alleged onset date, Emerich was "of advanced age," and at the time of the hearing, on the cusp of her 60th birthday, she was "closely approaching retirement age." 20 C.F.R. §§ 404.1563(e), 416.963(e).

Emerich has at least a high school education, is able to communicate in English, and has past work experience as a secretary. Emerich last engaged in substantial gainful activity at her alleged onset disability date in November 2012, although she has worked on a limited, part-time basis with UPS after that date. In her application, Emerich claimed disability based on anxiety, depression, psoriasis and high cholesterol. By the time of her hearing, Emerich also complained of physical limitations caused by neck, shoulder and low back pain, along with numbness in her right arm and hand.

B. **Medical Records**

1. **Pre-November 2012**

The medical record contains some records pre-dating her alleged onset disability date, which concern psoriasis, elevated cholesterol test results, right hand carpal tunnel syndrome, and an emotional breakdown at work in October of 2012 that apparently immediately preceded her termination. (AR 268-291.) Other than the note about her emotional breakdown at work and prescriptions for alprazolam and venlafaxine, these medical records do not appear relevant to her claim of disability.

2. **November 2012 - September 2015**

Following her termination from her secretarial job with Lincoln County, Wisconsin, in November 2012, for approximately three years, Emerich's medical record reveals

ongoing treatment for anxiety, depression and psoriasis. In particular, a note from her December 17, 2012, annual examination with her treating physician Tarun Bassi, M.D., reflects a rash under her breast, likely psoriasis. (AR 273.) Dr. Bassi also notes that "[t]he patient's anxiety related symptoms remain stable on venlafaxine." (AR 273.) However, Emerich denied any neck or musculoskeletal concerns, and no concerns were noted during physical examination. (AR 274-75.)

A year later, on December 18, 2013, Emerich underwent another annual examination by Dr. Bassi. Bassi's notes reveal that Emerich continues to be bothered by psoriasis, and that: "Her mood remains stable on venlafaxine; winter is once again not the best time, however, she has been tolerating the medications well, sleeping well and voices no other concerns." (AR 264.) During this appointment, Emerich again "[d]enies neck stiffness or lumps," and also "[d]enies joint pain, swelling or stiffness." (AR 265.) Dr. Bassi noted no additional concerns as part of the physical examination. (AR 266.)

Almost seven months later, apparently in connection with Emerich's benefits application, Joseph F. Roe, Psy.D., completed a psychological report dated July 26, 2014. In the report, Dr. Roe concluded, "Prognosis is poor. This person's anxiety has been a little less severe since not working, but is still crippling and has not abated despite psychiatric intervention. Furthermore, she has not really sought out psychotherapeutic intervention in years nor has she sought out a psychiatrist." (AR 308.) Specific to concerns about CPP, Dr. Roe opined, "Her concentration and attention were fair, but again, she would not maintain a normal work pace. She cannot handle normal life stressors and could not handle normal stress in the work environment." (*Id.*)

On December 15, 2014, Emerich attended her annual examination with Dr. Bassi.

In the records, Dr. Bassi noted Emerich's concerns about "trouble concentrating on one task." (AR 317.) Consistent with her prior annual appointments, Emerich again "[d]enies neck pain, back pain, joint pain, joint swelling." (AR 319.) The physical exam of her neck and back were normal. (AR 319.) In light of Emerich's concerns about concentration, however, Dr. Bassi referred her for neuropsychological testing. (AR 321.)

On February 11, 2015, Emerich saw Sarah Kortenkamp, Ph.D., who completed a neurobehavioral status examination. Dr. Kortenkamp diagnosed Emerich with "unspecified depressive disorder with anxious distress or unspecified anxiety; attention concerns." (AR 335.) Based on her interview, Dr. Kortenkamp marked certain limitations as "moderate," including the category for "concentration, persistence and pace." More specifically, Dr. Kortenkamp noted moderate limitation under: "carry out detailed instructions"; "maintain attention and concentration for extended periods"; and "complete a workday without interruptions from psychological symptoms." (AR 338.) Finally, Kortenkamp indicated that Emericah would miss work once per month. (AR 339.)[2]

### 3. October 2015 to September 2016

In October 2015, Emerich also began to see a number of doctors complaining of shoulder, neck, back, hip and leg pain. On October 28, 2015, Emerich had an appointment with Dr. Bassi to address right shoulder pain that she had been experiencing for four

---

[2] The medical record further contains "dermatology visit notes" from October 16, 2014, through this same period, and extending into 2016, but while Emerich claimed disability due to psoriasis as part of her application and during the hearing before an ALJ, she does not press this on appeal. Thus, the court will not describe these records in detail, other than to note that Emerich continued to suffer from extensive psoriasis on her scalp and other areas of her body, and she has tried a number of prescription medication and creams to treat it. (AR 340-42, 44-46, 49-53, 370, 374, 389, 396, 401, 408, 453.)

4

months. "It has kept her from doing some activities, and has affected her sleep, waking her at night. Right neck ache has also been present during this time." (AR 371.) Bassi's physical examination further revealed: "Painful extension, abduction and elevation of right shoulder. Tenderness over superior anterior part of right shoulder. Tenderness over right side of C-spine." (AR 372.) As a result, Dr. Bassi referred her to physical therapy. On December 30, 2015, Emerich had an PT initial evaluation, during which she rated her pain as 5-8 out of a possible 10, and reported that she was only operating at 35-40% of her normal activity level. (AR 380.) However, it does not appear that Emerich continued with physical therapy, or at least not the planned eight weeks of treatment.

A January 20, 2016, an x-ray of the C-Spine also revealed "[l]eft greater than right-sided osseous foraminal stenosis at C5-6 secondary to uncovertebral joint hypertrophy. Correlate for signs/symptoms of C6 radiculopathy. Multilevel cervical spondylosis is present as detailed above." (AR 385.) Consistent with the x-ray, a January 28, 2016, MRI of C-Spine also revealed: "Multilevel disc osteophyte complexes predominantly involving midcervical level as described. The changes are more prominent at C5-6 and C6-7 with moderate central canal and subarticular zone stenosis. Moderately severe right and moderate left foraminal compromise at C5-6." (AR 387.)

Emerich saw Dr. Bassi on March 28, 2016, to address her cervical spine stenosis. (AR 391.) She complained of pain in the "Right shoulder/upper arm. Left upper arm. Right mid posterior thigh." (AR 391.) During that meeting, Emerich reported that it has been present since the summer 2014[3] and had been gradually progressing. (AR 392.)

---

[3] In light of Emerich's report in October 2015 that the shoulder pain had been present for four months, this "summer 201<u>4</u>" date may have been reported or recorded incorrectly.

5

During the appointment, Emerich also complained of numbness in her right finger and weakness in her right hand. (AR 392.) The physical exam revealed tenderness in palpation and 4/5 on right shoulder exertional rotation, and "pain inhibition with testing of the shoulders. Scapulohumeral rhythm is decreased, right greater than left." (AR 393.) Dr. Bassi prescribed tramadol to help her sleep, as well as ordered shoulder x-rays to check for rotator cuff tearing. (AR 394.) A March 30, 2016, x-ray of Emerich's shoulders further revealed "[p]robable chronic bilateral rotator cuff pathology" noted. (AR 395.) And an April 5, 2016, MRI of her shoulder shows "very large full-thickness tear involving the supraspinatus tendon and upper half of the infraspinatus tendon." (AR 399.)

On May 18, 2016, Emerich met with Owen B. Keenan, M.D., to address shoulder and neck pain and tingling. (AR 403.) In reviewing the MRI, Dr. Keenan described the tear as "treatable but may not be repairable" with surgery. (AR 405.) Elaborating, Dr. Keenan indicated that she may need a "total joint arthroplasty," but he would want her to wait until she is older. (AR 405.) Ultimately, Dr. Keenan directed her to follow up with Dr. Peterson for a treatment plan.

On July 29, 2016, Emerich met with Dr. Peterson for follow-up on neck and shoulder pain, but Emerich's "main concern is new pain in the left posterior hip and leg." (AR 410.) Emerich reported that she woke up in pain four weeks prior to her appointment. Dr. Peterson referred her to physical therapy and ordered an MRI. Unfortunately, an August 10, 2016, MRI-L Spine revealed "L5-S1 asymmetric bilateral facet hypertrophy, much worse on the left, with surrounding left facet edema which may be an etiology for focal pain. Grade I degenerative anterior spondylolistheses L4-5 with bulging disc and facet hypertrophy with minimal existing foraminal narrowing. There is also a small left

6

paracentral focal disc protrusion at L4-5 narrowing the left lateral recess." (AR 442-43.)

On September 19, 2016, Emerich returned to Dr. Peterson for treatment of left lumbar radiculopathy. Emerich complained of "pain across the low back radiating down the lateral leg and knee to the ankle." (AR 445.) At that time, the plan was for Emerich to continue with aquatic therapy and taking hydrocodone. (AR 447.) However, in a letter dated October 28, 2016, Dr. Peterson reviewed Emerich's medical record, detailed her recent complaints of pain, and concluded "[i]n my opinion, the above conditions inhibit the patient to be substantially gainfully employed." (AR 457.) Dr. Bassi also submitted a letter, dated November 1, 2016, but in that letter she simply details Emerich's skin conditions. (AR 455.)

During this same period, from September 2015 through August 2016, Emerich saw psychiatrist Brigitte Espinoza, M.D., about mental health treatment. The notes reveal consistent reports of depression and anxiety, though at times her symptoms were better managed. Emerich also complained of pain and the impact of that pain on her mental health. (AR 415-435, 459-68.) Material to her appeal, a note from September 16, 2016, also states that Emerich "[e]njoys riding her horses and walking.riding 2 x week. Goes with a neighbor lady." (AR 466.)

### 4. Opinions of State Agency Consultant

Based on a review of her medical record, a state medical consultant Dr. Chan found no severe physical impairments in a report dated August 6, 2014. (AR 60-61.) In a report dated March 16, 2015, Dr. Mina Korshidi affirmed Dr. Chan's findings, again finding no severe physical limitations. (AR 73.) As Emerich points out in her appeal, however, both

7

of these reviews *pre*-date the onset of her shoulder, neck and back pain and the various tests obtained as part of the treatment of her pain.

As for her mental health limitations, Kyla King, Psy.D., conducted a file review, dated August 12, 2014, and concluded that "[s]he appears to be capable of meeting the basic mental demands of unskilled work." (AR 62.) In assessing her CPP, Dr. King found Emerich was moderately limited in her ability to carry out detailed instructions and maintain attention and concentration for extended periods, but otherwise finding her not significantly limited. (AR 64.) Deborah Pape, Ph.D., completed a second review on March 20, 2015, and similarly concluded that Emerich "appears to be capable of meeting the basic mental demands of unskilled work." (AR 75.)

## C. ALJ Opinion

Following an evidentiary video hearing held on December 1, 2016, at which Emerich appeared with counsel, the ALJ found that she had severe impairments for affective and anxiety disorders. (AR 12.) Notably, the ALJ did not find that she had any severe physical impairments. With respect to dermatitis in particular, the ALJ acknowledged "poor control" of the condition, but concluded that "she did not report any specific limitations related to this impairment." (*Id.*) Emerich does not challenge this finding.

As for her shoulder pain, the ALJ acknowledged the X-ray and MRI results, but also pointed out that Emerich is able to continue "riding horses twice per week" and that she "attended aquatic therapy twice per week, which helped manage her symptoms, and she took hydrocodone in the evenings, which allowed her to sleep." (AR 13.) Based on this,

8

the ALJ found that the impairment "does not meet the definition of 'severe' . . . because it is well controlled, of recent onset and does not significantly diminish the claimant's ability to perform work." (AR 13.) As for her lower back pain, the ALJ again discounted the pain because she "is able to drive, ride horses and indicated medication managed her symptoms." (AR 13.) The ALJ similarly concluded that it was not "severe" because "it is well controlled, of recent onset, and does not significantly diminish the claimant's ability to perform basic work activities." (AR 13.)

With respect to her mental health limitations, the ALJ concluded that Emerich does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (AR 13.) Plaintiff does not challenge that finding on appeal.

As for her residual functional capacity, the ALJ concluded that Emerich could still perform

> a full range of work at all exertional levels but with the following nonexertional limitations: she can frequently reach overhead bilaterally. The claimant can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. The claimant can never work at unprotected heights, near moving mechanical parts, or operate a motor vehicle. The claimant can perform simply, routine, and repetitive tasks but not at a production-rate page (e.g., assembly line work). She can make simple work-related decisions. She can occasionally interact with the public and coworkers and frequently interact with supervisors.

(AR 14-15.)

In formulating this RFC, the ALJ relied on notes in the medical record indicating that her mental health symptoms were stable on venlafaxine, which supported a finding of moderate mental limitations in the RFC assessment, but not marked. In so finding, the

9

ALJ placed little weight on Dr. Roe's July 2014 opinion, finding that it was internally inconsistent. The ALJ particularly faulted Roe for finding that Emerich's "memory attention, concentration and judgment were within normal limits," but then finding that her prognosis was poor and she could not handle a work environment. (AR 16-17.) The ALJ also placed only partial weight on the May 2015 report of neuropsychologist Dr. Kortenkamp's examination of Emerich, crediting her opinions about her moderate mental limitations, but not crediting her opinion that Emerich would miss work one day per month on the basis that Kortenkamp relied on claimant's self-report questionnaires. In contrast, the ALJ placed great weight on the two state agency consultants, both of which found moderate limitations, consistent with the medical record. Plaintiff does not challenge these finding.

As for physical impairments, the ALJ placed great weight on the opinions of state agency consultants Drs. Chan and Korshidi, both of whom concluded that Emerich did not have any severe physical impairments. The ALJ acknowledged that Emerich had "recent testing" that "found some objective evidence supporting physical problems, but . . . noted [that] those problems have yet to last twelve months." (AR 17.) The ALJ also discounted Dr. Peterson's October 2016 letter, placing little weight on it because it is "conclusory and not supported by an explanation." (AR 17-18.) The ALJ went on to summarize his findings on physical impairments:

> Although the claimant has recent shoulder and lower back pain, the evidence has not yet demonstrated that these conditions would persist long enough to significantly influence the claimant's ability to perform work activity. Such a finding is consistent with the claimant's activities, including her continued ability to care for and ride horses, drive, and perform chores. Nonetheless, in my RFC finding, I have limited the

> claimant's postural activities and reaching to avoid exacerbating her physical medically determinable impairments.

(AR 18.)

Finally, while the ALJ found that Emerich could not perform her past relevant work as a secretary, since it is a skilled occupation, he found that Emerich could perform the jobs of mail clerk and assembler. As such, the ALJ concluded that Emerich was not disabled through the date of the decision.

OPINION

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well-settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Accordingly, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). At the same time, the court must conduct a "critical review of the evidence," *id.* at 336, and insure the ALJ has provided "a logical bridge," *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Emerich raises two challenges to the ALJ's denial, which the court addresses in turn below.

11

## I. Finding of No Severe Physical Impairments

Emerich argues that the ALJ failed to evaluate adequately evidence of Emerich's shoulder, cervical and lumbar spine conditions, including improperly discounting Emerich's treating physician's opinions on these conditions. Plaintiff explains the significance of this error: if the ALJ had found that her physical impairments limited her to light work, she would have been found disabled under Social Security Administration's Grid Rule 202.06 when combined with her age. (Pl.'s Opening Br. (dkt. #8) 14.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

As described above, the ALJ acknowledged Emerich's complaints of shoulder, neck and back pain and the medical tests providing support for her subjective complaints, but discounted this evidence for two core reasons: (1) the pain was "well controlled"; and (2) the pain was of "recent onset." (AR 12-13.) As for the first finding, that the pain was "well controlled," this appears to rest on the ALJ's rejection of Dr. Peterson's opinion that Emerich's physical impairments "inhibit the patient to be substantially gainfully employed." (AR 457.) *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) ("[A] medical opinion that a claimant is unable to work is not an improper legal conclusion."). An ALJ is required to assign a treating physician's opinion controlling weight, provided the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques[,]" and it is "not inconsistent" with substantial evidence in the record. *Schaff v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also* 20 C.F.R. § 404.1527(c)(2). When an ALJ does not give a treating source controlling weight, the ALJ must consider the type, length and nature of the relationship, frequency of examination, specialty, tests performed, and consistency and supportability of the opinion. *Scott v. Astrue*, 647 F.3d 734, 739 (7th

Cir. 2011); 20 C.F.R. § 404.1527(d)(2). An ALJ who rejects a treating source opinion must provide a sound explanation for doing so. *See Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

The ALJ rejected Dr. Peterson's opinion on the basis that it was "conclusory and not supported by the evidence." (AR 18.) In drawing her conclusion, however, Dr. Peterson actually described in great detail plaintiff's complaints of pain and the x-ray, as well as MRI evidence supporting her complaints of pain, including findings of "left-sided disc herniation with left L5 lateral recess narrowing in addition to degenerative spondylolisthesis at L4-5;" "a very large full-thickness tear involving the supraspinatus tendon and half of the infraspinatus tendon"; and "prominent cervical spondylosis with moderate spinal canal stenosis at C5-6 and C6-7." (AR 457.) Dr. Peterson then describes how Emerich's neck pain, low back pain radiating into her left leg, and shoulder pain and weakness result in "great physical limitations." (*Id.*) In short, Dr. Peterson's opinion, in particular her October 28, 2016, letter, can neither be fairly described as "conclusory" nor as unsupported "by an explanation," and, therefore, the court rejects this as a "sound" basis for discrediting Dr. Peterson's opinion.

As for the ALJ's other basis for finding her pain "well-controlled," the ALJ appears to rely on the state agency consultants' conclusion that Emerich did not suffer from any physical impairments, but both of those opinions *pre*-dated Emerich's onset of physical pain in the fall of 2015. As such, neither Dr. Chan nor Dr. Korshidi, nor any other physician, has reviewed those medical findings and opined on whether the tests support a finding of a severe physical impairment. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) ("An ALJ should not rely on an outdated

assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.").

The ALJ also appears to rely on a September 16, 2016, reference in a psychiatrist's notes that Emerich "[e]njoys riding her horses and walking.riding 2 x week." (AR 466.) The ALJ, however, did not explore this activity with Emerich during the hearing itself, and, therefore, there is nothing to support his conclusion that: (1) she was able to participate in riding (or even in walking) a horse during episodes of increasingly severe debilitating pain in her neck, lower back, left leg and shoulder; *or* (2) riding (apparently, walking, not trotting or galloping) a horse for some unknown period of time two times per week would be inconsistent with her complaints of pain and weakness. Moreover, while Emerich reported some benefit from the aquatic therapy, including benefit to her mental health, the record does not support a finding that the aquatic therapy resolved her complaints of pain. At minimum, the ALJ failed to build a logical bridge between his conclusions that Emerich's pain was well-controlled and the physical evidence and medical opinions to the contrary, including Dr. Peterson's as her treating physician.

The ALJ also rejected a finding of a severe physical impairment because her complaints of pain were of "recent onset" and that the "evidence has not yet demonstrated that these conditions would persist long enough to significantly influence the claimant's ability to perform work activity." (AR 12-13, 18.) As plaintiff explains in her brief, the test is not whether the condition *had lasted for twelve months* at the time of the hearing. "Under the applicable disability analysis, a claimant will be found to be disabled if she shows the existence of a medically determinable physical or mental impairment that *will last at least twelve months* or result in death." *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir.

14

2007) (emphasis added).  Regardless, the record reflects that plaintiff: (1) sought medical treatment for pain dating back to October 2015; (2) had MRI results supporting her complaints of neck and shoulder pain dating back to January 2016, which were available at the time of the hearing; and (3) had suffered physical impairments for at least one year.

In light of this evidence, the ALJ again, at minimum, failed to offer a sound explanation for rejecting plaintiff's apparent physical impairments and a treating physician's opinion simply because of their "recent onset." *See also Lambert*, 896 F.3d at 775 ("Degenerative conditions often get worse over time.").  Of course, as plaintiff acknowledges in her reply brief, the ALJ may need to consider on remand whether a later *onset* date (e.g., fall 2015) is appropriate. *See Haynes v. Barnhart*, 416 F.3d 621, 624 (7th Cir. 2005) (holding that an ALJ is authorized to issue partially favorable decision using another onset date to determine the date of disability).  Regardless, for the reasons set forth above, the court agrees with plaintiff that the ALJ erred in addressing plaintiff's evidence of severe physical impairments and will reverse and remand for further consideration.

**II. Treatment of CPP Limitation in RFC**

Plaintiff also seeks remand based on the ALJ propounding a hypothetical question for the Vocational Expert that failed to account for his finding of moderate limitations in concentration, persistence and pace.  Because the court agrees with plaintiff as to the need for a remand based on her first claim of error, the court will simply require that the ALJ also further explain on remand why limiting Emerich to "simple, routine, and repetitive tasks but not at a production-rate pace (e.g., assembly line work)" adequately addressed

her specific limitations with respect to concentration, persistence and pace.  *See Crump v. Saul*, No. 18-3491, slip op. at *7 (7th Cir. July 31, 2019) ("[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift.").

ORDER

IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying claimant Beryl Vandre Emerich's application for disability and disability insurance benefits is REVERSED AND REMANDED for further proceedings consistent with this opinion and the fourth sentence under 42 U.S.C. § 405(g).  The clerk of court is further directed to enter final judgment for plaintiff accordingly.

Entered this 2nd day of August, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge